IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)


GOESER V. VAN METER, INC.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


DAN GOESER, APPELLANT,

V.

VAN METER, INC., APPELLEE.


Filed April 7, 2020.    No. A-19-742.


Appeal from the Workers' Compensation Court: J. MICHAEL FITZGERALD, Judge. Affirmed.

Jennifer L. Turco Meyer, of Dyer Law, P.C., L.L.O., for appellant.

L. Tyler Laflin, of Engles, Ketcham, Olson & Keith, P.C., for appellee.


PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

Dan Goeser was injured during the course of his employment with Van Meter, Inc., on August 11, 2016. Although he was awarded a 35-percent loss of earning capacity, he claims the Workers' Compensation Court should have found that he was an odd-lot worker with a 100-percent loss of earning capacity. We affirm.

BACKGROUND

Goeser began employment with Van Meter in April 2016. On August 11, he sustained a back injury arising out of and in the course of his employment with Van Meter, and he has complained of severe back pain ever since. He was terminated from his employment at Van Meter in February 2017.

On May 11, 2017, Goeser filed a petition in the Workers' Compensation Court seeking compensation for injuries sustained in the course of his employment with Van Meter on August

- 1 -

11, 2016. Specifically, he sought temporary and permanent disability benefits, payment of medical expenses and mileage, future medical, right to rehabilitation, and attorney fees. In its answer, Van Meter admitted that Goeser sustained injuries out of and in the course of his employment with Van Meter, but the company disputed the extent of the injury, including any permanent physical restrictions and/or resultant loss of earning capacity.

Trial was held on January 11, 2019. The parties had reached agreement on a number of issues. The major issue of contention, and the only issue relevant to this appeal, was Goeser's loss of earning capacity, and we limit our discussion of the evidence accordingly. Goeser was the only witness to testify. However, numerous exhibits were received into evidence.

Goeser (37 years old) testified that at the time he was hired by Van Meter in April 2016, he had chronic conditions of fibromyalgia and depression, and he had hearing loss in both ears, a bulging disc in his neck, and a "hip issue" on his left hip. He was able to manage these conditions "mostly with medication," and would ask for help "lifting or reaching" when needed. Goeser started working for Van Meter as a "[l]ean construction coordinator"; some of his job duties included organizing supply orders and shipments, managing heavy equipment, and performing tool maintenance and inventory. On August 11, Goeser injured his back when he squatted down to lift some sheet metal into a dumpster. He "felt a sharp pain in [his] back towards the middle." Goeser initially self-treated with ice, ibuprofen, rest, massage, and a "TENS" unit. When those methods did not work, he went to his family doctor, who then referred him to a back specialist, Dr. Matthew P. West.

Medical records from Dr. West were received into evidence. Dr. West first saw Goeser on September 7, 2016, and assessed him with "[m]echanical/myofascial thoracolumbar pain" and "[m]idline thoracic pain, intermittent aching around the ribs." Goeser was to initiate physical therapy, a steroid dose pack taper was described, and other medications were to be utilized. Dr. West's September 7 return to work/status report form had checked boxes indicating that Goeser could work full-time on light duty and was to "change positions as needed for symptom control." A thoracic MRI in October 2016 revealed a small disc protrusion at T6-7. Goeser later received an interlaminar epidural steroid injection for "[d]iskogenic thoracic pain" on November 30. Dr. West's December 16 return to work/status report form had checked boxes indicating that Goeser could work full-time on light-medium duty and again indicating that he was to "change positions as needed for symptom control"; a subsequent report form dated February 3, 2017, stated "continue current restrictions."

Goeser testified that from the time of his accident in August 2016, he continued to show up to work at Van Meter, but "didn't do much work." He was under restrictions, but "[t]here wasn't much light duty that I could do, so . . . they kept me mostly in the trailer on the computer," or sometimes Goeser would drive something to another place on site. Goeser was terminated from his employment at Van Meter on February 15, 2017, because they eliminated his position and there were no other positions that could accommodate his restrictions. However, the company paid him until March 1 so that he could have insurance through March.

Medical records from Dr. West show that Goeser received a second interlaminar epidural steroid injection for "[d]iskogenic thoracic pain" on March 1, 2017. And a return to work/status report form dated March 13 had checked boxes indicating that Goeser could work full-time "[s]edentary." Progress notes from March 27 stated that Goeser was unable to complete a full

regimen of physical therapy as recommended because Goeser reported that workers' compensation had not approved additional visits. During his testimony, Goeser agreed there was a gap in treatment from March to October 2017 "when the work comp insurance was denied."

In April 2017, Dr. Dean Wampler performed an independent medical examination (IME) of Goeser. (Dr. Wampler had previously performed an IME in January, but did not determine that Goeser was at maximum medical improvement (MMI) at that time.) In his April report, Dr. Wampler stated, "I disagree with Dr. West and I do not believe there are any additional treatments, interventions, or procedures that can be reasonably expected to improve Mr. Goeser's symptoms or functions," and MMI "should have been assigned on Dr. West's last visit of March 27, 2017." (Underscoring in original.) Dr. Wampler concluded that Goeser sustained a 1-percent permanent partial impairment of the whole person as a result of his work injury; he subsequently noted that Goeser did not require any permanent physical restrictions.

Progress notes by Dr. West reveal that Goeser returned to see him on October 26, 2017, and that "[s]ymptoms have returned to some extent through the mid back region." Dr. West recommended a medication regime and physical therapy with a transition to a work hardening program.

Goeser testified that after being terminated from Van Meter in February 2017, he applied for jobs weekly, but Cox Communications (Cox) was one of the few companies that would give him an interview. Goeser was hired to do residential customer service at Cox, and started his employment on December 2, 2017. Goeser said that at the time he was in the "sedentary" category with the restrictions given to him by Dr. West, and his position at Cox was a sedentary job assisting customers over the phone. Goeser stated, "[d]uring the training I was able to stand up, sit down, lay down in the classroom, if needed, stretch," and they had breaks almost every hour. After the 6-week training period, Goeser began the transition period where he had hands-on training with people listening in on calls. Goeser asked for a tall-back chair that was more supportive for his back, and for a sit-stand desk. (A return to work/status report form from Dr. West dated February 5, 2018, had a checked box indicating that Goeser was to "[c]hange positions as needed for symptom control," and in the comments section Dr. West wrote, "sit to stand desk" and "workstation." A subsequent form dated February 13 indicated a "[l]ight" duty category, and had a written notation of "10 min." next to "[c]hange positions as needed for symptom control.") Goeser testified that he was provided a sit-stand desk, but was told there was not a tall-back chair for him. Goeser stated, "Between the -- being stationary at a desk, sitting there and standing, it was very uncomfortable, very painful." "Most of the days when I got home I was just so worn out and so -- so miserable that I didn't sleep very well. I ended up missing quite a bit of hours and days from calling in from being in pain."

According to Goeser, he went to "HR" at Cox to resign (date not specified) because he was not physically capable of doing the job, but they provided him a different chair and he gave that a try; "It helped a little bit but it still wasn't enough." (A return to work/status report form from Dr. West dated March 7 had a checked box indicating that Goeser was only to work "[p]art-time," 4 hours per day.) Goeser testified that Dr. West put him down to a 4-hour day because that was about the most he could do, especially after sitting in a car for the 25 to 35 minute commute from home (he would get to work early so that he could lay on the break room couch to ease the pain before starting work). However, Goeser said that Cox could only accommodate the 4-hour work day for

about a week before he had to resign. Between January 1 and March 7, Goeser missed several days of work due to pain, and even if he had a doctor's note he still got an "occurrence" penalty for missing work. He had been given warnings about his absences, and he did not qualify for medical leave or FMLA because he had not worked for the company long enough. According to Goeser, he was told that on his next absence he would be let go, so he resigned to stay in good standing with Cox. (Our record indicates that Goeser resigned in mid-March.) Goeser testified that after leaving Cox, he applied for jobs "[a]nywhere [he] could find," but "couldn't find anything that would . . . call [him] back." On cross-examination, Goeser admitted he never called to follow up on positions for which he applied.

A return to work/status report form from Dr. West dated March 22, 2018, had checked boxes indicating that Goeser was only to work in a "light" duty category, "[p]art-time," 4 hours per day, 5 days per week, and was to "[c]hange positions as needed for symptom control," with a written notation of 15 minutes. Progress notes from March 22 stated that Dr. West was going to have Goeser obtain a surgical opinion. Dr. West's progress notes from June 14 stated that Goeser "had a surgical opinion with no surgical intervention recommended." Dr. West then referred Goeser for a functional capacity evaluation (FCE) to be completed "for documentation and recommendations with regards to permanent work restrictions moving forward."

The FCE was conducted on July 10, 2018, and the testing was determined to be valid by the physical therapist who conducted the evaluation. The FCE noted Goeser's lifting and carrying capacities during the exam. It also stated that Goeser "maintained a sitting posture for 13 minutes on average between the lobby and exam room"; "[s]tanding tolerance was 43 minutes on the initial functional portion of testing"; "[h]is standing tolerance significantly decreased during the second half of testing"; [a]verage standing tolerance in a full work day would be expected to be significantly less"; "[s]itting and standing tolerance is safe on an occasional basis"; and Goeser "required 2 rest breaks in supine with complaints of spasms and pain with deep breathing." Goeser testified that after his FCE he was in a lot of pain, was "totally bedridden," and did not sleep for 3 or 4 days.

In a letter to Van Meter's counsel dated August 3, 2018, Dr. West stated that Goeser was at MMI on June 14 and had a 6-percent permanent impairment rating to the body as a whole. Dr. West also stated that he agreed with the findings of the FCE, and that in his medical opinion, permanent restrictions

> would include light to medium work duty level with occasional lifting of up to 35 pounds, frequent lifting of up to 15 pounds, and constant lifting of up to 7 pounds. The work restrictions would also include repositioning every 15 minutes from sit to stand as needed for comfort. Would also recommend only occasional bending, lifting and twisting activity as well as any repetitive overhead activity involving the upper extremities.

Based on Dr. West's recommendation, Goeser attended a pain management program at the Nebraska Medical Center from September 4 through September 20, 2018. The psychology discharge summary stated that while in the program, Goeser participated in a daily exercise regimen, attended educational lectures, participated in psychotherapy sessions, and worked toward weekly goals set with the assistance of staff. He "was compliant with treatment." Physical therapy notes from the program stated that Goeser's "sitting tolerance is at least 20 continuous minutes

during lectures when distracted," "[h]e has been standing on average 2-3 times during a 60 minute lecture and typically uses ice just before the lecture for increased tolerance." Goeser testified the program was Monday through Friday, from 8 a.m. until approximately 4 p.m., and he iced as needed, about three to four times per day. He stated he missed 2 days in 1 week because of pain, and he was not able to complete the pain management program because the advanced exercises and the commute made his pain worse. Goeser stated, "[T]owards the end of the third week, I was doing the exercises in the morning, and it was just so painful that I had tears coming down"; he had to lay down for 2 to 3 hours icing his back. The psychology discharge summary stated:

> Unfortunately, Mr. Goeser's treatment was complicated by increasing pain symptoms and difficulty tolerating the physical therapy regimen. . . . [T]he patient's primary physical therapist[] expressed concern about his difficulties and the possibility that he may have an acute pain problem in addition to his chronic pain. As a result, Mr. Goeser's treatment at the Pain Management Program was terminated early.

Physical therapy progress notes from the pain management program stated "the team determined ending the program at this time may be in [Goeser's] best interest due to his pain progression and [Goeser] agreed with the recommendation." Goeser was to continue with his home exercise program at a slower rate than required at the program. He was also to followup with his physician.

Goeser stated he then went back to Dr. West and was assigned permanent restrictions. "I told him . . . my [sitting and standing] max[] is 10 to 15 minutes, 20 minutes on a very, very good day, or right after icing, and he agreed." A return to work/status report form from Dr. West dated October 9, 2018, had checked boxes indicating that Goeser could work "[f]ull time" in a "[l]ight med" duty category (which, according to the form, has a "[l]ift, carry, push-pull force" of 35 pounds occasionally, 15 pounds frequently, and 7 pounds constantly), could do occasional bending and twisting of the back/neck, and was to "[c]hange positions as needed for symptom control" with a handwritten notation of "15 min"; there were also handwritten comments for a sit to stand desk, a chair with back support, and to allow Goeser a 15-minute break to ice his back three times a day.

Ted Stricklett, the vocational consultant agreed upon by the parties, performed a loss of earning capacity analysis, and his report was dated November 6, 2018. Stricklett did not testify at trial, but his report was received into evidence. In his report, Stricklett stated he interviewed Goeser on October 8, and he also reviewed a letter from Van Meter's counsel to the parties dated September 28, emails between the parties dated October 3, IME reports from Dr. Wampler dated January and April 2017, medical records from Dr. West, and the FCE. According to Stricklett's report,

> [w]hen evaluating the effect of a permanent impairment upon one's earning capacity, four factors must be considered: one's ability to procure employment generally; one's ability to earn wages in one's employment; one's ability to perform the tasks of the work in which one is engaged; and, one's ability to hold a job obtained.

Stricklett provided two opinions, one that took into consideration the opinion of Dr. Wampler, and a second that took into consideration the permanent physical restrictions that were identified by Dr. West on October 9, 2018. Stricklett stated, "If consideration is given to the opinion of Dr.

Wampler, that Mr. Goeser has no permanent physical restrictions as a result of his [work injury], then his loss of earning capacity is 0%." However, "If consideration is given to the permanent restrictions that have been recommended by Dr. West, it is my opinion that Mr. Goeser would be an 'odd-lot' worker and his loss of earning capacity would be 100%."

When considering Dr. West's restrictions, Stricklett determined that Goeser's loss of access to jobs was approximately 86 percent. Stricklett noted that he conducted a labor market research study and was unable to identify suitable employment for Goeser in the open labor market. Although two employers stated that they may be able to accommodate Goeser's restrictions, they could not guarantee that parts of the job would not require the ability to stand for more than 15 minutes or require bending and twisting on more than an occasional basis; further, the employers noted it would be difficult to allow for three 15-minute breaks so that Goeser could ice his back. According to Stricklett, "Goeser's previous employment is classified in the Light, Medium, and Heavy physical demand category or the positions require frequent bending, stooping, and standing. Therefore, it appears that Mr. Goeser meets the definition of an odd-lot worker."

> In his progress notes from December 11, 2018, Dr. West stated that Goeser
>
> [t]olerates the Butran's patch well and it is effective for his symptoms. He has tried multiple other medication regimens and has the chronic thoracic pain at this time. Has been through therapy and chiropractic care as well. He is functional on this medication and continues to work. No progressive neurological changes or new symptoms. Overall doing pretty well.

The progress notes also stated, "Work restrictions updated today on a permanent basis." The return to work/status report form dated December 11 had checked boxes indicating that Goeser could work "[f]ull time" in a "[l]ight med" duty category (which, according to the form, has a "[l]ift, carry, push-pull force" of 35 pounds occasionally, 15 pounds frequently, and 7 pounds constantly), could do occasional bending and twisting of the back/neck, and was to "[c]hange positions as needed for symptom control"; handwritten comments/instructions stated chair with a back, sit to stand desk, and ice three to four times daily "15 min in chair."

Additionally on December 11, 2018, Dr. West answered two questions posed in a letter from Van Meter's counsel on November 29. Counsel's letter stated he was in receipt of Dr. West's August 3 and October 9 reports regarding Goeser's permanent restrictions, and counsel asked that Dr. West "please clarify the same based upon our discussion." The letter then contained the following.

> 1. I previously gave the opinion that Mr. Goeser should reposition every 15 minutes from sit to stand as needed for comfort. I do not believe that it is medically necessary that he reposition from sit to stand every 15 minutes. The intent was to convey my opinion that he should be allowed to move positions as needed for comfort during an 8 hour work day, which I do believe is medically necessary.
>
> Do you agree with these statements and do they accurately convey your opinion on permanent restrictions as you intended?
>
> [Blank lines to mark for "YES" or "NO."]
>
> 2. I previously gave the opinion that Mr. Goeser should be allowed a 15 minute break for icing three times daily. The intent was to convey my opinion that he should be

allowed to ice his back as needed for comfort, the same of which could be done at a work station.

Do you agree with these statements and do they accurately convey your opinion on permanent restrictions as you intended?

[Blank lines to mark for "YES" or "NO."]

Dr. West put an "X" to mark "YES" to both questions.

In a letter to both parties' counsel dated December 14, 2018, Stricklett noted that he had received an email from Van Meter's counsel on December 12 with an updated medical report from Dr. West. Counsel requested that Stricklett review Dr. West's updated report and issue a supplemental loss of earning capacity analysis. In particular, Stricklett noted that on December 11 Dr. West checked "Yes" in response to the two questions posed by Van Meter's counsel above. In his report, Stricklett stated, "If consideration is given to the physical restrictions that have been assigned by Dr. West on 10/9/18 and 12/11/18, it is my opinion that Mr. Goeser's loss of earning capacity would be approximately 35%." He noted that appropriate placement considerations for Goeser in the open labor market included security/gate guard, light delivery driver, telerecruiter/inbound telephone clerk, customer service representative, front desk clerk, inventory specialist in certain settings, and cashier.

In a subsequent email to both parties' counsel on December 27, 2018, Stricklett confirmed his opinion from the December 14 report. He noted that his original loss of earning capacity report on November 6--finding a 100-percent loss of earning capacity--was based on Dr. West's October 9 opinion that Goeser "'*must reposition every 15 minutes* and he can bend and twist on an occasional basis.'" (Emphasis in original.) Stricklett then noted that in Dr. West's opinion on December 11 and the "Return to Work/Status Report Form" from that same day, Dr. West did not indicate that Goeser must reposition every 15 minutes as he had previously noted on October 9; rather, in his December 11 opinion "Dr. West noted that Mr. Goeser does NOT need to reposition every 15 minutes but 'be allowed to move positions as needed for comfort during an 8-hour work day,'" and on the work status form "Dr. West . . . checked 'Change positions as needed for symptom control.'" Because Dr. West no longer indicated that Goeser must reposition every 15 minutes, Stricklett's opinion remained the same as noted in his December 14 report (i.e., that Goeser had a 35-percent loss of earning capacity).

Goeser testified that the December 11, 2018, appointment was the last time he saw Dr. West. However, in a letter to Goeser's counsel dated December 26, Dr. West stated that "[l]ong-term chronic pain management through pain management clinic would be beneficial." And Dr. West's medical records show a referral on January 9, 2019, for Goeser to have a pain management consultation; under "[r]eferral [r]eason," it stated "[p]atient [p]reference."

Goeser testified that he did not have a social life anymore, and that it was very hard for him to function on a day-to-day basis. He "barely contribute[d] to the household." He has to cook dinner in stages, sitting down for a while in the process. "About the only time that [he] ever leave[s] the house is to help . . . grocery shop" since he does the cooking, but he tries to keep it to about 30 minutes, and whenever it gets too painful, he leaves. (According to Stricklett's original report in November 2018, Goeser made similar statements during the interview on October 8.)

At the time of trial, Goeser stated he was medicating with duloxetine, baclofen, melatonin (for sleeping), and the generic version of a Butrans patch (for pain); all but the duloxetine are mentioned in Stricklett's November 2018 report. Goeser testified he had not had a full night of sleep since the accident. He can be in one position for 5 to 10 minutes on a bad day, and about 15 to 20 minutes on a good day. After sitting or standing in the same position for a while, he gets cramping in the middle of his back "on both sides" and radiating pain through his ribs. Dr. West recommended chronic pain management and Goeser thought this would be necessary because based on what everyone had told him, his pain is something he would have to live with for the rest of his life.

Goeser did not have a college degree. When asked if, prior to his injury, he had ever done a sedentary job, Goeser responded that he had done some technical support, but most of his jobs had been physical and active. He has fibromyalgia, a preexisting condition, and "the more active [he] can be, the less pain [he] ha[s]." (His fibromyalgia was mentioned throughout the medical reports and in Stricklett's loss of earning capacity analysis.) Goeser wants to work, but does not see any way he could work 40 hours per week. He stated, "I can barely make it through the day at home, let alone . . . get employment and be dependable." On cross-examination, Goeser acknowledged that, at the time of trial, he was not limited by medical providers from working a 40-hour work week. Goeser last saw Dr. West on December 11, 2018, and was released to full duty, and to reposition as needed. Goeser stated that when he asked the nurse about a 15-minute up/down restriction, "the nurse came back and said that [Dr. West] was told by [Goeser's] lawyer that it didn't have to be in writing to be 15 minutes, even though he agreed that the 15 minutes was needed." On redirect, Goeser agreed that at the last appointment with Dr. West, it was his (Goeser's) understanding that Dr. West was referring him to another doctor. Goeser intended to bring up the sit/stand restriction with his new pain management doctor.

The compensation court issued its award on May 14, 2019, and its further award on July 1. The court found that Goeser reached MMI on June 14, 2018, ordered Van Meter to pay certain medical expenses, and determined that Goeser was entitled to specified temporary benefits and future medical care. The court, referencing Stricklett's December 2018 report and subsequent email, agreed that Goeser had a 35-percent loss of earning power. Additionally, the court ordered that Goeser was entitled to a vocational rehabilitation evaluation.

Goeser now appeals.

## ASSIGNMENT OF ERROR

Goeser assigns that the compensation court erred when it determined he only suffered a 35-percent loss of earning capacity, when the evidence before the court supported a finding that he was an odd-lot worker entitled to permanent total disability benefits.

## STANDARD OF REVIEW

A judgment, order, or award of the compensation court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the judgment, order, or award; or (4)

the findings of fact by the compensation court do not support the order or award. *Martinez v. CMR Constr. & Roofing of Texas*, 302 Neb. 618, 924 N.W.2d 326 (2019).

An appellate court is obligated in workers' compensation cases to make its own determinations as to questions of law. *Interiano-Lopez v. Tyson Fresh Meats*, 294 Neb. 586, 883 N.W.2d 676 (2016).

Whether a claimant has suffered a loss of earning power or is totally disabled are questions of fact. *Armstrong v. State*, 290 Neb. 205, 859 N.W.2d 541 (2015). Upon appellate review, the findings of fact made by the trial judge of the compensation court have the effect of a jury verdict and will not be disturbed unless clearly wrong. *Davis v. Goodyear Tire & Rubber Co.*, 269 Neb. 683, 696 N.W.2d 142 (2005).

ANALYSIS

Goeser claims that the compensation court erred by finding that he had a 35-percent loss of earning power because the evidence before the court supported a finding that he was an odd-lot worker entitled to permanent total disability benefits.

Whether Goeser is totally and permanently disabled is a question of fact, and when testing the trial judge's findings of fact, we consider the evidence in the light most favorable to the successful party and give the successful party the benefit of every inference reasonably deducible from the evidence. See, *Money v. Tyrrell Flowers*, 275 Neb. 602, 748 N.W.2d 49 (2008).

Total disability does not mean a state of absolute helplessness. *Armstrong v. State, supra*. It means that because of an injury (1) a worker cannot earn wages in the same kind of work, or work of a similar nature, that he or she was trained for or accustomed to perform or (2) the worker cannot earn wages for work for any other kind of work which a person of his or her mentality and attainments could do. *Id*. Furthermore, a worker may be totally disabled even though the worker is able to work in some limited capacity. See *id*.

Under the "odd-lot" doctrine, total disability may be found in the case of workers who, while not altogether incapacitated for work, are so handicapped that they will not be employed regularly in any well-known branch of the labor market *Id*. The essence of the test is the probable dependability with which the claimant can sell his services in a competitive labor market, undistorted by such factors as business booms, sympathy of a particular employer or friends, temporary good luck, or the superhuman efforts of the claimant to rise above his crippling handicaps. *Heiliger v. Walters & Heiliger Electric, Inc.*, 236 Neb. 459, 461 N.W.2d 565 (1990).

Goeser argues that the "trial court's determination [(that he had a 35-percent loss of earning power)] fails to recognize that even though Dr. West's restrictions of October 2018 [("Change positions as needed for symptom control" with a handwritten notation of "15 min")] and December 2018 [("Change positions as needed for symptom control")] are worded differently, they are functionally the same restriction when put into practice by an employer." Brief for appellant at 21. And "[i]f the restrictions are functionally the same, Stricklett's opinion that the October 2018 restrictions produce[] an odd-lot determination and the December 2018 restrictions produce a 35% determination is [sic] erroneous and unsound." *Id*.

A loss of earning power evaluation performed by a vocational rehabilitation counselor selected by the parties is entitled to a rebuttable presumption of correctness. *Frauendorfer v. Lindsay Mfg. Co.*, 263 Neb. 237, 639 N.W.2d 125 (2002). See, also, Neb. Rev. Stat. § 48-162.01(3)

(Reissue 2010). In this case, Stricklett was the vocational consultant agreed upon by the parties. He provided an initial loss of earning capacity analysis in November 2018 opining that Goeser was an odd-lot worker based on the restrictions in Dr. West's October 9 report. However, Dr. West subsequently clarified the October 9 restrictions given by him, as evidenced by him putting an "X" to mark "YES" to questions posed by Van Meter's counsel. The effect of the clarification was to note that Goeser should be allowed to change positions as needed, rather than to note a specific time period of 15 minutes. Additionally, in the work/status report form dated December 11, Dr. West checked the box indicating that Goeser was to "[c]hange positions as needed for symptom control." After Dr. West's clarifications, Stricklett updated his report in December, at which time he opined that Goeser had a 35-percent loss of earning capacity.

Van Meter contends that Stricklett's December 2018 report opining that Goeser had a 35-percent loss of earning capacity "should be given the rebuttable presumption of correctness and given that the same was not rebutted it should be presumed correct." Brief for appellee at 9. Van Meter likens this case to *Variano v. Dial Corp.*, 256 Neb. 318, 589 N.W.2d 845 (1999). In *Variano*, "each party claim[ed] the benefit of a rebuttable presumption pursuant to . . . § 48-162.01 . . . based upon seemingly inconsistent opinions regarding loss of earning power expressed by the same court-appointed vocational rehabilitation counselor." *Id*. at 319, 589 N.W.2d 847. In his first report dated September 1996, the appointed counselor stated that Variano required vocational rehabilitation services and would sustain a 25- to 30-percent loss of earning capacity as a result of his work-related injury. After submitting the report, the counselor continued working toward identifying a specific vocational goal which would restore Variano to suitable work, but before completing that process the counselor requested clarification from Variano's primary care physician concerning Variano's functional impairments and restrictions. After receiving the information from the primary care physician, the counselor completed his vocational analysis and concluded in a February 1997 letter report that Variano would not benefit from vocational rehabilitation. In March, Variano's attorney wrote a letter to the counselor requesting clarification of the counselor's opinion regarding Variano's loss of earning power, as it appeared that the counselor concluded that Variano's loss of earning power was now 100 percent, as opposed to the earlier opinion of 25 to 30 percent. In the counselor's response letter, he stated his opinion that Variano would not benefit from vocational rehabilitation services and was totally disabled as a result of the injury. The trial court, relying on the counselor's September 1996 report, found that Variano was not totally disabled and had sustained only a 30-percent loss of earning capacity. However, on appeal, the Nebraska Supreme Court found that the September report constituted the counselor's opinion up to that point in time as to what Variano's loss of earning capacity would likely be after he received the vocational rehabilitation services which the counselor then believed would benefit him. However, in February 1997, the counselor described his unsuccessful efforts to identify suitable employment which would be consistent with Variano's physical restrictions, and the counselor therefore felt Variano would not benefit from vocational rehabilitation services. Therefore, the Nebraska Supreme Court stated that it appeared that was the counselor's final opinion based upon his evaluation of Variano's potential for employment, which the counselor had not completed at the time of his earlier report. The Nebraska Supreme Court concluded that "when considered together in their chronological sequence, the counselor's opinions establish[ed] a rebuttable presumption that the employee sustained a total loss of earning power as a result of

his compensable injury and that the evidence [was] insufficient as a matter of law to rebut the presumption." *Variano v. Dial Corp.*, 256 Neb. At 319, 589 N.W.2d at 847. Accordingly, the Nebraska Supreme Court reversed and remanded to the compensation court for further proceedings.

Goeser on the other hand contends that *Variano v. Dial Corp., supra*, is factually distinguishable because "Stricklett's second report was not issued 'as part of the process of recovery' after [Goeser] had participated unsuccessfully in a vocational rehabilitation plan." Reply brief for appellant at 5. Rather, "Stricklett's second report was authored at the request of Van Meter in response to what Stricklett assumed was a different set of facts (i.e., a change or 'clarification' in postural limitations by Dr. West)." *Id*. at 5. Goeser contends that this case is more analogous to *Noordam v. Vickers, Inc.*, 11 Neb. App. 739, 659 N.W.2d 856 (2003). In *Noordam*, the vocational rehabilitation counselor submitted two reports regarding Noordam's loss of earning capacity. According to the trial court, the counselor opined that Noordam had anywhere from a 0-percent loss of earning capacity to a 15-percent loss of earning capacity, depending upon which physician's restrictions were used. After considering the counselor's report, the FCE, and the expert testimony, the trial court concluded that Noordam suffered a 15-percent loss of earning capacity. On appeal, this court stated "the evidence indicates that [the counselor's findings] in her reports are independent of each other and based on a different set of facts in one situation versus the other"; "[t]he contrary opinions do not reflect Noordam's recovery, but, rather, [the counselor's] uncertainty as to the underlying facts." *Noordam v. Vickers, Inc.*, 11 Neb. App. at 745, 659 N.W.2d at 861. We noted that § 48-162.01(3) does not discuss multiple reports by the same vocational rehabilitation counselor and which report should receive the presumption, and that § 48-162.01(3) does not preclude or limit the trial court from making factual findings to determine which report is entitled to the rebuttable presumption. We therefore concluded:

> [W]hen a vocation rehabilitation counselor submits multiple reports that are determined to be written not because a process of recovery was incomplete from the time a prior report was written, but, rather, because a counselor gives differing opinions each based on a different factual scenario, it is up to the trial court to make factual findings to determine which report should be given the rebuttable presumption.

*Noordam v. Vickers, Inc.*, 11 Neb. App. at 746, 659 N.W.2d at 861.

This court also addressed a case involving multiple loss of earning reports by the same counselor in *Ladd v. Complete Concrete*, 13 Neb. App. 200, 690 N.W.2d 416 (2004). In *Ladd*, a court-appointed vocational rehabilitation counselor authored a report on loss of earning capacity concluding that Ladd's loss of earning capacity was 100 percent; the counselor subsequently drafted a letter to address questions from the employer's counsel and at that time concluded that Ladd's loss of earning capacity was 70 percent (this conclusion considered a physician's letter given to the employer's counsel regarding how Ladd's employment opportunities might be improved with a hearing aid in certain environments). The trial court found that the physician's letter could not form the basis for the counselor to revise her opinion, and concluded that Ladd was permanently and totally disabled. On appeal, this court concluded that the situation was more analogous to *Noordam v. Vickers, Inc., supra*, than *Variano v. Dial Corp., supra*, and that the trial court was therefore entitled to make factual findings to determine which report was permitted the

rebuttable presumption of correctness. And although the trial court did not make a finding with regard to the statutory presumption, it implicitly determined that the earlier report was entitled to the presumption, a determination which this court could not say was clearly erroneous.

In closing arguments before the compensation court, Van Meter's counsel acknowledged that the only difference between Stricklett's November and December 2018 loss of earning capacity reports was that the November report was based on a change in positions with an actual time frame of 15 minutes, and the December report was based on a change in positions as-needed. Goeser's counsel argued that "the troubling thing about this . . . is the functional restriction on my client could be worse than 15 minutes if he is having a lot of pain," "[i]t could be that he needs to move in six minutes." Goeser's counsel also noted that when an agreed upon expert "changes their opinion in multiple reports, not because of progression of the actual condition but because of some scenario that they're giving you," then the judge "get[s] to decide" the rebuttable presumption. The trial court did not "see that much difference between . . . every 15 minutes and as-needed." But then later noted that the FCE limited Goeser's sitting but said he could stand for 43 minutes in the morning and then a shorter period of time in the afternoon; and the "FCE gave some indication he can do some kind of work." However, the court voiced its concern as to whether somebody would hire Goeser with his restrictions.

In its award, the trial court recounted that in Dr. West's letter dated December 11, 2018, Dr. West clarified Goeser's restrictions and did not believe that it was medically necessary that Goeser reposition from sitting to standing every 15 minutes; rather his intent was that Goeser be allowed to change positions as needed for comfort during an 8 hour workday, which Dr. West did believe was medically necessary. The compensation court noted that Dr. West's opinion of December 11 was presented to Stricklett who prepared a loss of earning power report finding Goeser had a 35-percent loss of earning power. The compensation court agreed that Goeser had a 35-percent loss of earning power, and also found that Goeser was unable to return to his previous employment and was therefore entitled to a vocational rehabilitation evaluation if he desired one.

We agree this case is more akin to *Noordam v. Vickers, Inc., supra*, and *Ladd v. Complete Concrete, supra*, because Stricklett's reports were written not because a process of recovery was incomplete from the time a prior report was written; rather, he gave differing opinions each based on a different factual scenario. Thus, the trial court was entitled to make factual findings to determine which report permitted the rebuttable presumption of correctness.

Although the trial court did not explicitly grant the rebuttable presumption of correctness to any one of Stricklett's opinions, the court apparently concluded that such presumption should be applied to Stricklett's opinion that Goeser had incurred a 35-percent loss of earning capacity, a determination which we cannot say was clearly erroneous.

As stated in *Variano v. Dial Corp.*, 256 Neb. 318, 326, 589 N.W.2d 845, 851 (1999),

[a] "rebuttable presumption" is generally defined as "[a] presumption that can be overturned upon the showing of sufficient proof." . . . "In all cases not otherwise provided for by statute or by these rules a presumption imposes on the party against whom it is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence."

(Citations omitted.)

By finding that Goeser was entitled to a loss of earning capacity of 35 percent, the trial court implicitly found that Goeser had not rebutted the presumption that Stricklett's December 2018 report was correct.

However, Goeser argues that the trial court's factual finding that Goeser's loss of earning capacity was 35 percent was not supported by the evidence. Goeser claims that the evidence showed: he would have to change positions at least every 15 minutes to control his symptoms, and more often than that on bad days; he was unable to keep his job with Cox because they were unable to accommodate his restrictions and the performance of his job duties and the daily commute lead to a significant and intolerable increase of his pain; and it was unreasonable to think Goeser would be able to work full-time when he was too disabled to participate in a full-time pain management program aimed at simply treating his pain. "All of these facts unequivocally support a finding that Goeser is not employable in any competitive labor markets." Brief for appellant at 21.

However, while the record does show that Goeser's sitting posture was limited, it also showed that his standing posture was not as limited. The FCE specifically noted that Goeser initially had a standing tolerance of 43 minutes, but that decreased over time during testing. And Stricklett's November 2018 loss of earning capacity report referenced that two employers could not guarantee that parts of the job would not require the ability to stand for more than 15 minutes. Additionally, physical therapy notes from the pain management program reveal that it was the physical therapy regimen (particularly the advanced exercises) that caused Goeser's pain to become so severe that he could not complete the program. But the notes also reveal that Goeser's "sitting tolerance is at least 20 continuous minutes during lectures when distracted," "[h]e has been standing on average 2-3 times during a 60 minute lecture and typically uses ice just before the lecture for increased tolerance." And Dr. West's return to work/status report form dated December 11, 2018, stated that Goeser is capable of working full-time with certain restrictions.

Whether a claimant has suffered a loss of earning power or is totally disabled are questions of fact, and we cannot say that the compensation court erred in finding that Goeser had a 35-percent loss of earning capacity. See, *Armstrong v. State*, 290 Neb. 205, 859 N.W.2d 541 (2015); *Davis v. Goodyear Tire & Rubber Co.*, 269 Neb. 683, 696 N.W.2d 142 (2005).

CONCLUSION

For the reasons stated above, we affirm the decision of the workers' compensation court.

AFFIRMED.